## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ROBERT C. RAY,

    Plaintiff,

v.                                                                        CASE NO: 8:04-cv-251-T-26TBM

NEW YORK TIMES MANAGEMENT
SERVICES d/b/a THE SARASOTA
HERALD-TRIBUNE,

    Defendant.
_____/

## **O R D E R**

Before the Court is Defendant's Motion for Summary Judgment, Defendant's Statement of Undisputed Facts, and numerous supporting documents (Dkt. 25), Plaintiff's Response in Opposition (Dkt. 28), Plaintiff's Statement of Undisputed Facts (Dkt. 29), and Defendant's Supplemental Authority (Dkts. 30 & 31).[1]  After careful consideration of the submissions of the parties and the entire file, the Court concludes that summary judgment should be granted.

---

[1]  Defendant cites D'Angelo v. Conagra Foods, Inc., No. 04-10629, 2005 WL 2072131 (11th Cir. Aug. 30, 2005), in which the Eleventh Circuit in a case of first impression recognized a claim for failure to reasonably accommodate a "regarded as" qualified individual with a disability.

**Background**

Plaintiff Robert C. Ray bought this action pursuant to the Americans with Disabilities Act, 42 U.S.C §12117 (ADA) and the Florida Civil Rights Act of 1992 (FCRA) for discrimination, failure to reasonably accommodate, retaliation, and creation of a hostile work environment.  Since April 29, 1994, Ray worked as a press machinist for the Defendant Sarasota newspaper company (the Tribune) until his termination on May 25, 2002.  Ray claims that after he contracted Hepatitis C, he was denied reasonable accommodation on two separate instances.  He also alleges that the Tribunes' disclosure of his medical condition to co-workers created a hostile work environment and that he was retaliated against for complaining about the disclosure.  The following pertinent facts have been culled from the seemingly confusing and contradictory submissions and are presented in the light most favorable to the non-moving party, Ray.

*Events Leading up to Medical Leave*

On June 8, 2001, Ray was diagnosed with Hepatitis C by Dr. Kevin Witt.  (Dkt. 25, Exh. E at 71 and depo. exhs. 14-16).  Ray told the Human Resources Director, Patricia McConnell, on June 29, 2001, of the diagnosis.  He asked her not to share the information with any non-essential personnel. (Dkt. 25, Exh. E at 107).  He also told her that he would be needing to take medical leave very shortly in order to begin a rigorous treatment program.

In compliance with company policy, Ray also told his supervisor, Michael Bradshaw, on July 1, 2001, about the diagnosis.  One or two days after he told Bradshaw,

Ray's work shift was changed from 7:30 a.m. to 3:30 p.m. to 8:30 a.m. to 4:30 p.m, despite his request to Bradshaw to continue working his earlier shift. (Dkt. 25, Exh. E at 223). When he complained to Bradshaw about the shift change interfering with his late afternoon medical appointments, Bradshaw did nothing. (Dkt. 25, Exh. E at 223-24). Bradshaw needed to keep a machinist on duty later in the day, and the machinist with seniority wanted the earlier shift, leaving only Ray to take the later shift. Bradshaw refused to allow him to leave early one day in July 2001 for a medical appointment. Ray began leave pursuant to the Family Medical Leave Act (FMLA) on August 1, 2001, with the first interferon treatment occurring on August 10, 2001.[2]

### Events Occurring Once Medical Leave Began

Ray testified at his deposition that he had complained to McConnell in August 2001 regarding Bradshaw's previously telling some co-workers about his diagnosis.[3] (Dkt. 25, Exh. E at 163-64). Ray did not learn about Bradshaw's disclosure until Ray had been on FMLA leave for three weeks. (Dkt. 25, Exh. E at 25). It is disputed whether a co-worker named Timothy Wolfinger obtained knowledge about the diagnosis from Ray or from Bradshaw. (Dkt. 25, Exh. F at 13-14 & 34-35). Wolfinger did not find out about

---

[2] He also began receiving short term disability benefits in August 2001.

[3] McConnell denies that Ray ever related to her in any manner his complaint about the leak of his medical information to non-essential employees. (Dkt. 25, Exh. A).

Ray's condition until after Ray took leave. Wolfinger noted that there were rumors afloat at work about his condition.

In Ray's words, his co-workers "ostracized" him and displayed fear of contracting Hepatitis C. One co-worker, Vince Caruso, expressed concern to his superior, Chuck Chambers, about contracting Hepatitis C through spit or saliva. (Dkt. 25, Exh. D at 9, 12, 19-20 & 23). When Chambers researched the issue on the internet, he learned that any such fears should be alleviated. (Dkt.25, Exh. D at 9, 12 & 23). Nevertheless, Ray claims that Bradshaw's reckless and intentional disclosure added to the already hostile work environment resulting from his inability to keep his early work shift.

Ray began seeking long term disability (LTD) benefits by December 2001. One of Ray's physicians, Dr. Ali Saifi, wrote on Ray's disability form dated November 29, 2001, that Ray could return to light duty work. (Dkt. 25, Exh. G at depo. exh. 1). Dr. Saifi testified that he wanted Ray to receive LTD benefits but he did not want Ray to lose his job; therefore, he reached a compromise, permitting him to return to work under restrictions. (Dkt. 25, Exh. G at 7-8). Dr. Saifi noted limitations with regard to pushing, pulling, lifting, sitting, walking, climbing, and other activities. Another physician of Ray's, Dr. Kamath, on November 27, 2001, wrote that Ray could return to work once the interferon treatment ended.[4] (Dkt. 25, Exh. E at depo. exh. 30). Dr. Kamath had earlier

---

[4] The treatment ended in February 2002.

written on July 31, 2001, that Ray could not work at all during the interferon treatments. (Dkt. 25, Exh. E at depo. exh. 18).

In January 2002, Ray approached McConnell about returning to work on light duty after his treatment ended; however, McConnell refused to offer to allow Ray to return to work in the future, even on light duty. McConnell told him that the Tribune could not accommodate him on light duty in the position of press machinist.[5] At this point, Ray became depressed about not being able to return to work. His medical condition declined, Ray contends, as a direct result of the depression he experienced over not being permitted to return to work once treatments stopped. The treatment caused him to lose a great deal of weight, left him fatigued, anxious, achy and in pain. (Dkt. 25, Exh. G at 5-6). He was having difficulty walking and showed symptoms of myalgia, muscle pain, and weakness. (Dkt. 25, Exh. G at 6).

By mid-February 2002, he was clearly unable to work, even at light duty. Ray wrote in a daily journal dated February 24, 2002, that he had lost approximately fifty pounds since the treatments began and that he could return to work only if "they are going to drive me, give me a bed, allow me to take my pain medication— My job is a very dangerous job— I'm not about to get hurt or hurt somebody else." (Dkt. 25, Exh. E at

---

[5] After Ray began seeking LTD benefits, the Tribune hired an additional person to help in the machinery area. The Tribune contends that the new employee was not a replacement for Ray, because he did not have the same job description as Ray. Ray contends that he was replaced, even though the Tribune knew he wanted to return to work after the interferon treatments ended.

depo. exh. 29). Thus, although Ray had his physicians' reports from November 2001 returning him to light duty beginning February 17, 2002, in actuality, on February 17, 2002, his physicians did not approve of his release to work. (Dkt. 25, Exh. E at 193-203).

*Termination*

From December 31, 2001, through May 21, 2002, Ray received LTD benefits, having been initially approved for LTD benefits by the Tribune's administrator, Metlife, on January 23, 2002.[6] (Dkt. 25, Exh. E at 140 & depo. exh. 26). Metlife withdrew benefits, however, effective May 23, 2002, for failure to meet the policy's definition of totally disabled. (Dkt. 25, Exh. E at depo. exh. 30). The Tribune terminated Ray as soon as Metlife withdrew LTD benefits. Although the Tribune administratively discharges an employee when that employee qualifies for LTD, which in Ray's case was in January 2002, once the LTD status ceases,[7] the Tribune terminates the employee. At that time, all benefits cease and the Tribune sends a COBRA notice for health insurance purposes (Dkt. 25, Exh. A).

As of April 2, 2003, over one year later, Ray was released by Dr. Saifi to return to work with no restrictions. (Dkt. 25, Exh. A). The Tribune never returned Ray to work, despite his attempts to be rehired.

---

[6] His LTD benefits were awarded retroactively to December 31, 2001.

[7] Ray did not appeal the May 2002 denial of his LTD benefits.

**Argument**

The Tribune argues that Ray cannot show that he was a qualified individual with a disability as that term is defined under the ADA. Even assuming he could meet the test of a qualified individual with a disability, the Tribune argues that Ray cannot show that (1) he was terminated "because of" a disability, (2) he was denied reasonable accommodation, (3) he suffered a hostile work environment, or (4) he was retaliated against. With respect to the allegations regarding nondisclosure, the Tribune asserts that the nondisclosure requirements of the ADA apply only to the results of a medical examination ordered by the employer.

Ray counters that material factual disputes exist as to whether (1) he is a qualified individual with a disability under the ADA, particularly the "regarded as" definition, (2) he was discriminated or retaliated against, (3) he worked in a hostile work environment, (4) he was terminated for non-legitimate reasons, and (5) he was denied reasonable accommodations for his disabilities. On summary judgment, this Court will construe all evidence in the light most favorable to the nonmoving party, Ray.

**Qualified Individual/ Reasonable Accommodation**

The ADA prohibits covered employers from discriminating against "a qualified individual with a disability because of the disability of such individual" in a term, condition or privilege of employment. See Davis v. Florida Power & Light Co., 205 F.3d 1301, 1304-05 (11th Cir.), cert. denied, 531 U.S. 927 (2000). A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform

the essential functions of the employment position that such individual holds or desires."
42 U.S.C. § 12111(8).  The "essential functions" of the job are "the fundamental job duties of a position that an individual with a disability is actually required to perform." Earl v. Mervyns, Inc, 207 F.3d 1362, 1365 (11th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(2)(1)).  Thus, Ray must show that he could perform the essential functions of the job of press machinist with or without a reasonable accommodation at the end of his treatment.  See Davis, 205 F.3d at 1305.

Ray urges that on two different occasions the Tribune refused requested reasonable accommodations.  First, Bradshaw failed to allow him to continue his 7:30 a.m. to 3:30 p.m. shift to enable him to make certain medical appointments.  Second, while Ray was on leave undergoing treatment, McConnell made the decision not to accommodate him returning to work on light duty.  In other words, if Ray returned, he was to do so on an "all or nothing" basis.

The Tribune is neither required to restructure the position of press machinist nor to eliminate the essential functions of a press machinist in order to accommodate Ray.  See Earl, 207 F.3d at 1367.  The record supports a finding that the position of press machinist requires lifting, climbing, pushing, and other activities which were restricted greatly by Dr. Saifi's November 2001 report permitting Ray to return to work in February 2002. Although Ray claims that he could have been given "bench work" to perform, the Tribune is under no obligation to change the essential strenuous requirements of the job— disassembling, moving, and operating heavy machinery.  Thus, there is no question that

even if he could have physically performed light duty in February 2002, he could not have performed the essential requirements of a press machinist.

The Court notes that much has been made of the contradictory nature of Ray's statements made before the Social Security Administration, his deposition testimony, and his affidavit testimony, and whether Ray has adequately explained the discrepancy. The Court finds that Ray has explained his seemingly contradictory positions, taking as true his contention that the onset of his depression at the thought of not being able to return to work, coupled with the ongoing interferon treatments, caused the further deterioration of his health in January and February 2002. In November 2001 when his doctors approved his return to light work after the treatments concluded, no one had any way of knowing what his actual medical condition would be at the end of treatment. The fact that he became depressed because the Tribune would not allow him to return to light duty in February 2002, does not convert the Tribune's decision into a refusal to grant reasonable accommodation, thereby making that decision discriminatory.[8]

---

[8] Ray also asserts that under the "regarded as" disability provision, see 42 U.S.C. § 12102(2)(C), he was a qualified individual and could have performed the duties of his job had he received reasonable accommodation. See D'Angelo. Thus, if an employer mistakenly believes that an actual nonlimiting impairment substantially limits one or more major life activities, then the plaintiff may assert that he was regarded as disabled and discriminated against. See Sutton v. United Air Lines, 527 U.S. 471, 489 (1999). Ray contends that a genuine issue of material fact exists as to whether the Tribune regarded him as disabled and whether he was able to perform the essential functions of his job in spite of his condition.

The Court finds that no genuine issues of material fact exist. In this case, the Tribune merely considered only those limitations that Ray brought to its attention, and those limitations were "not an erroneous perception, but instead [were] recognition of

**Retaliation**

Ray asserts that he was retaliated against after he complained to McConnell about Bradshaw's disclosure of his medical diagnosis. To the extent Ray contends he was retaliated against by McConnell's making mistakes on his short term and long term disability benefit applications and payments, all these problems were rectified, resulting in payment to Ray of an even greater amount of money than he was due. He was not retaliated against by McConnell's refusal to return him to light work after his treatment, because McConnell was justified in not changing an essential function of the job as set forth above. Finally, tying his complaint made to McConnell in August 2001 to his termination in May 2002 does not meet the proximity requirement to manifest causation between the complaint and the act of termination. The Tribune's reason for termination comported with its business policy of termination after cessation of LTD benefits, and Ray, even if he could have established a prima facie case, has not carried his ultimate burden of persuasion that the Tribune intentionally discriminated against him. See Equal Employment Opportunity Comm'n v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1273 (11th Cir. 2002).

---

fact[s]." See Bray v. National Servs. Indus., Inc., 209 F.Supp.2d 1343, 1351 (M.D. Ga. 2001, aff'd, 34 Fed.Appx. 391 (11th Cir. 2002) (quoting Hilburn v. Murata Elec. N. Am., Inc., 181 F.3d 1220, 1230 (11th Cir. 1999)).
    Even assuming the Tribune incorrectly perceived Ray as being precluded from performing his job, Ray cannot show that such limitations precluded him from performing a broad range of jobs. See Rossbach v. City of Miami, 371 F.3d 1354, 1359 (11th Cir. 2004). Indeed, the record reveals that the Tribune currently employs an individual with Hepatitis C in the pressroom.

**Hostile Work Environment**

To establish a hostile work environment, Ray must show, among other factors, that the discriminatory conduct was so severe, humiliating, and frequent as to unreasonably interfere with his work performance. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The evidence highlighted by Ray includes the change in his shift soon after he told Bradshaw of his diagnosis, Bradshaw's refusal to permit him to attend a medical appointment, Bradshaw's disclosure of his medical condition to co-workers,[9] and his co-workers' fear of him. Ray testified at deposition that his co-workers were fearful of his illness and that he felt as though he were being treated as a leper. (Dkt. 25, Exh. E at 174). In his affidavit, Ray averred that he was ostracized by his co-workers and he described himself as being branded with the "scarlet letter." (Dkt. 29, Exh. 1 at paras. 13 & 16).

The Court finds that, considering the evidence as a whole, the working conditions for Ray were not so severe, humiliating, or frequent as to constitute a hostile work environment. The frequency with which his co-workers ostracized him has not been established. In fact, much of the evidence shows that some of the co-workers did not learn of his condition until after he took FMLA leave. Even if Ray was feeling uncomfortable during his last month or so on the job, there is no evidence supporting numerous, specific incidents to amount to a hostile work environment. While Bradshaw

---

[9] While conceding that the disclosure of his medical condition by his supervisor cannot meet the burden of a per se claim under the ADA, Ray posits that such intentional and reckless disclosure is evidence of the hostility shown by the Tribune.

should not have disclosed Ray's medical condition to co-workers, the evidence does not support a finding that such disclosure created or added to a hostile work environment.

With respect to the action of Bradshaw, Ray simply has not shown that as a result of his treatment by Bradshaw in changing his shift or refusing to allow him to make one medical appointment, the atmosphere was so severe, humiliating, or frequent as to subject him to unbearable working conditions.  Thus, even assuming Ray was a qualified individual with a disability under the ADA, the evidence pertaining to the hostile work environment claim is woefully deficient.

It is therefore **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt. 25) is **GRANTED.**  The Clerk shall enter judgment in favor of Defendant.  The Clerk is directed to close this case.

**DONE AND ORDERED** at Tampa, Florida, on October 6, 2005.

          s/
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**

<u>**COPIES FURNISHED TO**</u>:
Counsel of Record